M8M7MCG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA,

          v.                           22 Cr 00352 (JSR)

ANTHONY MCGEE,


          Defendant.

                            Bail Application
-------------------------------x

                            New York, N.Y.
                            August 22, 2022
                            3:05 p.m.

Before:

                   HON. JED S. RAKOFF,

                            District Judge

                     APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  RUSHMI BHASKARAN
    Assistant United States Attorney

RUHNKE & BARRETT
    Attorney for Defendant
BY:  JEAN DESALES BARRETT

M8M7MCG

1          THE COURT:  Good afternoon.

2          All right.  So we're here on a bail application for

3     Defendant McGee.

4          I'll ask each counsel, when they talk, to go to the

5     rostrum because you can take off your mask there and that makes

6     it much easier to understand you.  We'll begin with counsel for

7     the defendant.

8          MS. BARRETT:  Yes, your Honor.

9          Your Honor, I first would like to identify some of the

10    people who have come today in support of Mr. McGee.  His

11    fiancée and future wife is here, Simone Ramirez.  Next to her

12    is Jaelynn Johnson, who is the goddaughter who wrote a very

13    lovely letter.  In the back of the room, the young child is his

14    godson.  There are other family members, other friends to

15    support him.  In addition to that, your Honor, Mr. Sonny

16    Miranda who wrote a letter on behalf -- and he's affiliated

17    with the Central Family Life Center -- your Honor, he is here.

18    He has said that not only would he welcome Mr. McGee back to

19    the program -- and he's happy to give your Honor some more

20    information about the program -- in addition to that, he has a

21    job offer, which is the third job offer that he has.

22          There's Mr. Lopez.  And then I didn't note in my

23    memorandum that Mr. Morales wrote a letter.  On page 15 of the

24    letters, Mr. Morales says that he, as well, would have a

25    position available for Mr. McGee if Mr. McGee were permitted to

M8M7MCG

1    be free on bond.

2            THE COURT:  I'm delighted to have all those folks

3    here.  Thank you very much for bringing them.

4            MS. BARRETT:  Would you like to hear from Mr. Miranda

5    about Mr. McGee's experience with his --

6            THE COURT:  I think maybe at some point, but let's set

7    the stage, so to speak.

8            MS. BARRETT:  Sure.

9            Your Honor, my focus here is on the language of our

10   Second Circuit that the Bail Reform Act presumes release and a

11   small, very small, identifiable group of individuals should be

12   incarcerated.  I understand, and Mr. McGee understands that his

13   criminal history is something that weighs against him in this

14   particular situation.  But I believe that all of the letters

15   and the willingness of people to sign a bond for him -- six

16   different people are willing to sign a bond -- all of those

17   promises for work, the assurance of his probation officer from

18   the City of New York, and the assurance from Mr. Miranda and

19   the manager of the Central Family Life Center, all attesting to

20   Mr. McGee's character and his change in his life.

21           THE COURT:  Bear with me one second.  I'll tell you

22   why in a second.

23           (Pause)

24           THE COURT:  The reason I interrupted, I don't think I

25   ever saw the -- presumably, there was a pretrial officer's

M8M7MCG

1    recommendation that was made to Magistrate Aaron when this case

2    was first presented, but I don't think I've seen that.

3              Do either counsel happen to have a copy of that?

4              MS. BARRETT:  We are not allowed to take them.

5              MS. BHASKARAN:  Same, your Honor.  The pretrial

6    officer recommended detention.

7              THE COURT:  Yes.  But I would have liked to have seen

8    what he had to say.

9              THE DEPUTY CLERK:  I'm going to call the magistrate.

10   Give me a second.

11             THE COURT:  Go ahead.  I'm sorry for the interruption.

12             MS. BARRETT:  Sure.

13             I neglected to identify that Daquan McGee, who is

14   Mr. McGee's younger brother.  He also wrote a letter of

15   support.  I think the letters from Daquan and their sister,

16   Melissa, are telling that they acknowledge his history, they

17   acknowledge that he has been in a bad place, but they say he's

18   in a good place now, and they want him to continue to be in

19   that good place.  They all believe that Mr. McGee has gone

20   through a rehabilitative experience.  And it would be difficult

21   to ignore the feelings of all of these people and their

22   willingness --

23             THE COURT:  What am I to make of anything -- and maybe

24   the answer is nothing -- of the fact that Mr. McGee was one of

25   numerous defendants in this case who sent letters to the Court

M8M7MCG

1  saying that they were overriding their counsel's advice and

2  were asking that no pretrial motions be made and that the

3  matter proceed more quickly to trial?

4          What struck me about those letters is they were all

5  virtually word for word the same, suggesting that the

6  defendants in this case are still in close coordination.  Now,

7  that may be perfectly legitimate, but it seems, perhaps, a

8  little inconsistent with the notion that Mr. McGee has turned

9  his life around and is on a different path.

10          MS. BARRETT:  Your Honor, we have been over this in

11  detail.  It is my understanding that Mr. McGee wants to

12  withdraw that letter, that he personally did not send it.

13          THE COURT:  Well, if that's true, I think I need to

14  inquire of him directly --

15          MS. BARRETT:  Sure.

16          THE COURT:  -- if you have no objection to it.

17          MS. BARRETT:  I have no objection, your Honor.

18          THE COURT:  All right.  So, Mr McGee, you know the

19  letter I'm talking about?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  You're withdrawing it?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  You say you didn't send it?

24          THE DEFENDANT:  My fiancée and me had a discussion

25  about said letter and we were under the impression at the time

M8M7MCG

```
1    that it was one of a good decision, but I didn't have a visual

2    look at it.

3              THE COURT:  So, how had this letter come to be

4    written?

5              THE DEFENDANT:  It was given to her.

6              THE COURT:  Given to?

7              THE DEFENDANT:  My wife.

8              THE COURT:  Who then passed it on to you?

9              THE DEFENDANT:  Yes.

10             THE COURT:  Do you know who gave it to her?

11             THE DEFENDANT:  No.

12             THE COURT:  Well, she's here, yes?  Let's ask her.

13             MS. BARRETT:  Your Honor, I don't think it was ever

14   passed to Mr. McGee, just to clarify that.

15             THE COURT:  I'm sorry?

16             MS. BARRETT:  I believe the letter was never passed to

17   Mr. McGee.  It was not mailed from --

18             THE COURT:  Oh, I'm sorry, it was never --

19             THE DEFENDANT:  It was never presented to me.  I spoke

20   to my wife about it.  She felt comfortable, so I agreed for her

21   to push it.

22             THE COURT:  So maybe counsel can clarify this.

23             From your discussions, what is your understanding of

24   exactly what occurred here?

25             MS. BARRETT:  My understanding is that Ms. Ramirez
```

M8M7MCG

discussed this letter, which she received from someone else.

She discussed it with Mr. McGee.  They were under a very

different understanding as to the significance of this letter.

Unfortunately, they didn't run it by me first, which would have

been good.  But they both have since conferred after both of

them talking to me.  I spent a good deal of time discussing

this matter with them and they both agree that it was a

mistake.

THE COURT:  So, two different questions.

Back to you, Mr. McGee.  First, are you withdrawing

that letter and the request made in that letter?

THE DEFENDANT:  Yes, sir.

THE COURT:  Second, what is your understanding as to

who that letter originally came from?

THE DEFENDANT:  I believe it came from Mr. Smith.

THE COURT:  Okay.  All right.  Go ahead, counsel.

MS. BARRETT:  Thank you, your Honor.  I'm glad we

could clarify that matter.

So, your Honor, I guess what I was addressing the

Court about was the support of the members of the family, the

support of friends, the support of coworkers, the support of

people who supervise him, including the probation officer and

Mr. Miranda who supervised him at the Central Family Life

Center.  That program is called True 2 Life.  It's my

understanding that Mr. Miranda was hoping that Mr. McGee could

M8M7MCG

1      take on a mentorship role as a person demonstrating that he has

2      turned his life around.

3              Your Honor, with regard to the other -- it was one

4      other thing that I really wanted to focus on, and it just flew

5      out of my head.

6              THE COURT:  Being considerably older than you are, I

7      understand that completely.

8              MS. BARRETT:  You flatter me, your Honor.

9              THE COURT:  Anyway, why don't we go to the government

10     and I'll give you a chance to respond in any event.

11             MS. BARRETT:  Thank you.

12             MS. BHASKARAN:  Thank you, your Honor.

13             I know your Honor now has some familiarity with the

14     nature of the case and the allegations in the case, so I'll be

15     brief in this description.

16             THE COURT:  Well, forgive me for interrupting.

17             Do I understand that the government does not contend

18     that Mr. McGee is a flight risk and is basing this solely on

19     danger to the community?

20             MS. BHASKARAN:  That's correct, your Honor.

21             THE COURT:  There is a reference made to his prior

22     record, but that's one of the reasons -- I'm sorry, I didn't

23     see the pretrial --

24             THE DEPUTY CLERK:  It's coming.

25             THE COURT:  All right.  Maybe the government

M8M7MCG

1    presumably has the information.

2              What is his prior record?

3              MS. BHASKARAN:  It's extensive, your Honor.  I believe

4    it demonstrates a continuous pattern of misconduct.

5              So, to summarize it, his first criminal conviction was

6    in February of 2008.  That was a conviction for felony robbery.

7    He received one to three years'.

8              THE COURT:  How old was he there?

9              MS. BHASKARAN:  I believe he was 18 years old.

10             At the same time, on April 9 of that same year, 2008,

11   he was also convicted of assault in the third degree.  I

12   believe that was a misdemeanor.  Perhaps that was wrapped up

13   with the other case, but he received a conditional discharge

14   for that case.  He was released from prison in October 2010.

15             He's next arrested in April of 2012, so about a year

16   and a half later.  The plea in that case is to criminal

17   possession of a weapon in the fourth degree.  He received a

18   short sentence there, I believe.  There's also some bench

19   warrants that were associated with that offense.  The next

20   arrest after that is October 16, 2013.  He ultimately pleads

21   guilty to robbery in the third degree.  Again, that's his

22   second felony robbery conviction.  This time he gets a term of

23   imprisonment of two to four years.  There are bench warrants

24   associated with that conviction as well.  I believe then he's

25   released from prison in June of 2016 and and his following

M8M7MCG

1    arrest after that is in August of 2019.  The plea there is to

2    assault in the third degree.  Again, there's notations of bench

3    warrants there, and he received a conditional discharge.

4         The next arrest, most recent arrest, not including the

5    arrest from the federal offense here, was from March 4, 2021,

6    so a year and some change ago.  There, he pleaded guilty to

7    disorderly conduct.  The arrest charges were for something more

8    serious, criminal possession of a weapon, but, obviously, we

9    would focus here on the plea, which was just disorderly

10   conduct.

11        THE COURT:  Well, maybe I missed something.

12        Although, there were those very serious robbery

13   charges, do I understand, if I followed you correctly, that the

14   only felony pleas or convictions since 2013 were one for which

15   you received a conditional discharge and one that was for

16   disorderly conduct?

17        MS. BHASKARAN:  That's correct.  So the last felony

18   conviction was from -- he was arrested for that offense on

19   October 16 of 2013.

20        THE COURT:  Well, obviously, that's a serious record.

21        Why isn't that at least arguably consistent with the

22   defense argument that is independently supported by the various

23   things they've submitted that he has basically turned his life

24   around, unless we look at the events that he's charged with

25   now, which we're going to get to in a minute?

M8M7MCG

1        But my point is not to minimize those two subsequent

2   matters, but they do not seem at the same level of his earlier

3   misconduct.

4        MS. BHASKARAN:  I agree, your Honor.  There's been

5   some diminution in the degree of his criminal convictions as

6   he's gotten older.  But, again, I think these prior criminal

7   convictions are very serious.  The fact that he's continued to

8   have arrests for conduct that is violent in nature should be

9   troubling.  The fact of the matter is that --

10        THE COURT:  Well, do we know much about the facts of

11   the disorderly conduct?

12        MS. BHASKARAN:  I don't, your Honor, other than I know

13   that the arrest charges included criminal possession of a

14   weapon.  And for the charge before that, the August 29 arrest,

15   the plea there was for assault in the third degree.

16        THE COURT:  Okay.  Now, he is listed in the

17   indictment, if I recall correctly, as number three of the

18   various defendants.  I assume the indictment basically tracks

19   the government's view of approximate culpability, yes?

20        MS. BHASKARAN:  I think that's right, your Honor.

21        THE COURT:  So the defense says in their submission,

22   for which I am very grateful, that he is not alleged to have

23   been present for or participated in acts or threats of violence

24   in terms of the pending indictment; is that correct?

25        MS. BHASKARAN:  Yes, your Honor.  It is difficult to

M8M7MCG

1    pinpoint each and every participant in the numerous acts of

2    violence that occurred in this case.  There are numerous acts

3    of violence.  Victims could not always identify their

4    assailants because these events happened very quickly.  Someone

5    runs up to them, sometimes multiple people run up to them and

6    they are sucker punched to the ground.  And all of these

7    assaults are unprovoked.  And there are insurance investors

8    going to homeowners --

9            THE COURT:  Well, I don't mean to minimize the overall

10   allegations and the indications on the face of the papers that

11   they involve both violence and threats of violence of a very

12   serious nature, but what I'm trying to focus in on is

13   Mr. McGee's involvement.

14           So, what led the government to place him as number

15   three in the indictment hierarchy?

16           MS. BHASKARAN:  Your Honor, so our investigation

17   included numerous interviews.  It also included wire taps on

18   two of his codefendant's phones, Mr. Jatiek Smith and Sequan

19   Jackson.  We also recovered a significant amount of evidence

20   from various other phone extractions.  Mr. McGee was

21   intercepted on numerous occasions on the Title 3 where it's

22   very clear that he is fully aware of the tactics that this

23   enterprise used, including the use of this extortion of

24   rotations systems where companies that wanted to stay in the

25   industry could only do so if they made these extortion payments

M8M7MCG

| 1 | to First Response.  It is amply clear from those interceptions
| 2 | that he's very much a part of administering that rotation
| 3 | system.

| 4 |       THE COURT:  Remind me of the event you're referring to
| 5 | now, such as, the evidence from the wire tap relates to what
| 6 | period of time?

| 7 |       MS. BHASKARAN:  This would be from 2020.  I think we
| 8 | started from October 2020 from June of 2022.

| 9 |       THE COURT:  Okay.

| 10 |       MS. BHASKARAN:  In addition, we have a chat where
| 11 | Mr. McGee and several codefendants are discussing a situation
| 12 | where a competitor was trying to take business away from First
| 13 | Response.  Mr. Smith, Jatiek Smith -- there's two Smith
| 14 | defendants in this case -- instructs Mr. McGee to go pull up on
| 15 | him and show some authority.

| 16 |       Later, Jatiek Smith says that someone should go slap
| 17 | the competitor.  McGee's response to the comment about slapping
| 18 | is, "It's whatever you want done."  And I think there, there's
| 19 | a fair inference that can be drawn that he understands the
| 20 | violence that is being used by the enterprise to control the
| 21 | industry and he's fully supportive of the violence that's being
| 22 | used.

| 23 |       The only other point that I'll note, your Honor, at
| 24 | least at this juncture, unless there's further questions, is
| 25 | that Mr. McGee is, from what I understand, a self-professed

M8M7MCG

1  member of the Bloods gang, which we all know is a very violent

2  street gang.  Many members of the enterprise that were charged

3  were also members of the Bloods.  And I think that fact is

4  important for the Court to consider in assessing whether there

5  are any conditions or combination of conditions that could

6  address the danger that they possessed.

7          But from the government's perspective, what we think

8  is a very significant criminal history, his gang membership,

9  and his participation in this offense which occurred while he

10  was on probation suggests to us that there aren't any

11  conditions that would reasonably protect against the danger

12  that he possesses.

13          THE COURT:  All right.  Thank you very much.  Let's go

14  back to defense counsel.

15          MS. BARRETT:  Well, your Honor, what I heard the

16  government saying was it's difficult to pinpoint what

17  Mr. McGee's role was in this so-called administration of

18  violent acts.  Difficult to pinpoint sounds to me like there

19  there's no proof that he was involved in physical violence

20  against anybody.

21          THE COURT:  Well, that may well be true based on what

22  I've heard so far.  But on the other hand, they indicate that

23  he had knowledge and was, at a minimum, fully on board in the

24  use of violence.

25          MS. BARRETT:  Well, let me put it this way.  We're

M8M7MCG

1    here with the presumption of innocence.  That's the

2    government's interpretation of a conversation in which we had

3    no access and no ability to explain or determine context, what

4    was the mood of the individuals engaged in this conversation.

5    All we have is an allegation of some words on the part of Smith

6    to Mr. McGee and Mr. McGee saying something that sounds to me

7    particularly gratuitous.

8              So, what I'm saying here, Judge, is --

9              THE COURT:  I don't think it has to do with the

10   presumption of innocence.  Because while I hold that very dear

11   to my heart, the immediate question is a factual one, and it's

12   one where the standard is essentially preponderance.  And it

13   is, in this particular case, whether him making that statement

14   that was just quoted, it was more likely than not that he was

15   approving the use of violence.

16             Now, you are quite right that you haven't had the

17   extensive discovery that the government is in the course of

18   providing that may shed further light on this.  That, of

19   course, was one of the reasons why I think Mr. McGee has

20   exercised excellent judgment in withdrawing his letter.

21   Otherwise, if I were to follow the path suggested in those

22   letters, we might have a trial in this matter without defense

23   counsel having more than the most trivial idea of what the

24   government's proof was, whereas under the present schedule, the

25   government is required to produce extensive discovery that

M8M7MCG

1    defense counsel would then have a chance to look at.

2              But my point is this:  As in every bail hearing, it is

3    always subject to further consideration if you discover new

4    information later that casts a different light.  But I, like

5    every judge in this point, have to make a determination as to

6    what I think is more likely than not about any given factual

7    assertion that is being made.  And it does sound to me that

8    it's more likely than not, on the limited amount of information

9    that I have, that it was acquiescence in a proposed act of

10   violence.

11             Why shouldn't I draw that conclusion?

12             MS. BARRETT:  Because that conclusion was the

13   conclusion that -- if you take the context there and the words

14   without putting it into the context of an entire conversation,

15   it's not fair to make that determination and to adopt the

16   government's version of what that conversation was about.

17   Words are words.  Very different.

18             THE COURT:  Well, let me ask a broader question.

19             MS. BARRETT:  Sure.

20             THE COURT:  And I think this is really one of the

21   issues that is at the heart of this application.

22             By the way, I commend the defense for their very

23   excellent presentation, both in writing and now orally in this

24   bail application.  But having had the pleasure and privilege of

25   Ms.  Barrett's presentations before, I wasn't surprised that it

M8M7MCG

1    was a terrific job.

2            MS. BARRETT:  Thank you, your Honor.

3            THE COURT:  But here is what I think is the problem is

4    that you face.  It's, if you will, two inconsistent pictures.

5    We have, on the one hand, your version of what's happened to

6    Mr. McGee supported not just by family members, although, they

7    are always important to the Court, but by independent persons

8    as well, saying this guy not only has turned his life around,

9    he's really become a very helpful participant in the various

10   programs he's involved in and so forth, and he has several

11   employment prospects.  What good will it be to lock him up for

12   X number of months when he has shown his ability to do things

13   the right way?

14           On the other hand, we have the government saying,

15   forget about the prior criminal history.  Although, that's not

16   irrelevant, obviously.  But what we have the government saying

17   is based on their investigation of the facts in this very case,

18   that within a very recent couple of years or so, he was

19   directly involved in a very, very serious racketeering

20   conspiracy.  So that's, I think, the clash that needs to be

21   resolved.

22           MS. BARRETT:  I think your Honor is capable of

23   resolving that clash because I am very familiar with the Court

24   as well.  But I would also point out that it has to be if your

25   inclination was the decision must be release.

M8M7MCG

1          THE COURT:  I understand that, and I agree with that

2     completely.  But usually, the facts are not 50/50, they're

3     usually at least 51/49.

4          MS. BARRETT:  Right.

5          THE COURT:  One of the things that trouble me --

6     that's why I asked the question earlier -- is if he really had

7     turned his life around in the way that you're suggesting, why

8     was he directly, or as it seems, indirectly participating in

9     this letter campaign that was presented to the Court, which

10    suggests a degree of continuing association with the people,

11    many of whom the evidence is very strong.

12         MS. BARRETT:  Your Honor, I think -- and I'm not going

13    to ask anybody to back up my thoughts here -- but my intuition

14    or inference based on what I know is that there may have been

15    pressure applied to Ms. Ramirez in a way that led her to

16    believe that it would be in Mr. McGee's best interest to go

17    along with this letter writing campaign.

18         THE COURT:  So, now, if I do grant bail, in these

19    kinds of situations, one of the normal conditions is that the

20    defendant have no further contact with anyone involved.  And I

21    would interpret that to mean not just direct contact, but

22    indirect contact, other than through counsel, of course.

23         So if, for example, I received another letter of that

24    nature from someone in his family who had shown it to Mr. McGee

25    and then sent it to the Court -- I'm making this up as a

M8M7MCG

1    hypothesis -- would it not be proper at that point for me to

2    feel that he had violated the conditions of release and revoke

3    bail?

4            MS. BARRETT:  Absolutely.  There is no question about

5    that.

6            I think that Mr. McGee and Ms. Ramirez fully

7    understand the Court's position with regard to this, and they

8    regret deeply that they became involved with this without

9    discussing it with counsel.  They understand that there's

10   absolutely no contact with anyone associated with the other

11   defendants in this case.

12           THE COURT:  Now, if you know and if you want to tell

13   me, is he still a member of the Bloods?

14           MS. BARRETT:  Your Honor, there's a thing about gangs

15   that I'm sure the Court is aware, it's that you can be

16   categorized in that fashion unless you actually take some sort

17   of affirmative action that's required.  You don't -- it's sort

18   of like once a Blood, or once a whatever, Trinitarios, or once

19   this, once that, you're always that, no matter what.  He could

20   be 100 and they could still be saying that about him.

21           So, I can tell you that he is not engaged with any

22   kind of criminal activity with regard to their gang.

23           THE COURT:  So if I were to release him, again, one of

24   the conditions, it seems to me, would have to be that he not

25   associate with anyone that he knows is a member of the Bloods.

M8M7MCG

1          MS. BARRETT:  Certainly.

2          THE COURT:  That would cover quite a lot of people, I

3    suspect, in his particular venue.

4          MS. BARRETT:  Yeah, well, I believe that if he were

5    released, he would like to reside with Ms. Ramirez in Newark.

6    So he would be away from the area where he, as a very young

7    man -- and by the way, he was 17 for that first arrest -- and

8    as a very young man became involved because of where he was,

9    because of his family's economic circumstances, the fact of

10   growing up in a single-parent home.  All of those things, we

11   know, expose young men to very negative influences.  He has

12   overcome that.  He is working very hard to take care of his

13   family.  He takes care of his children, the two youngest

14   children every weekend.  He obviously is a mentor and support

15   to Jaelynn Johnson, who is here.  His family is willing to

16   support him.  Everybody is willing to stand by.  Everybody

17   understands that one step over the line would mean

18   incarceration again, should the Court grant his release.  But I

19   do want to emphasize that.

20          I know the Court knows this, because I know the Court

21   sat through a capital case and has heard experts testify about

22   aging out and that process of basically growing up and how that

23   doesn't really happen when you're automatically 18 years old.

24   It takes a while for that brain to start making good decisions

25   and functioning well from an executive functioning point of

M8M7MCG

1   view.

2           THE COURT:  Give me, again, the bail conditions that

3   you would propose.

4           MS. BARRETT:  Proposing electronic monitoring with

5   home detention so that he could work, and that he would be

6   residing with Ms. Ramirez on South 11 Street in Newark.

7           By the way, your Honor, I also have -- and I'll just

8   tell you about it and I won't necessarily burden the Court with

9   more paperwork, but Ms. Ramirez canvassed her neighborhood and

10   had her neighbors sign a letter saying that they welcome

11   Mr. McGee's return to that community in Newark.  He would be

12   away from all of these people.  Also, there are six individuals

13   who are willing to sign a bond and --

14           THE COURT:  How much of a bond are you proposing?

15           MS. BARRETT:  I would think 250,000 would be an

16   appropriate bond.

17           THE COURT:  Cosigned by?

18           MS. BARRETT:  By Ms. Ramirez.  Jon Lopez would be

19   signing it.  Two of the individuals are managers at Duane Reade

20   where Ms. Ramirez is employed, and they've come to know

21   Mr. McGee through that.  Mr. Marrero.  There's one who is

22   employed in Walmart in Newburgh and is a salesclerk.

23           Obviously, these are not people who are wealthy, but

24   as I pointed out in the letter, they understand the

25   significance of making this kind of sacrifice.  And the moral

M8M7MCG

1    suasion involved is really important.  I think it's important

2    for Mr. McGee.

3          He hasn't received a copy of the letters because mail

4    is what it is, but I have read some of the letters to him this

5    afternoon and he was brought to tears with gratitude for what

6    people are willing to sacrifice for him.

7          THE COURT:  All right.  Let me go back to the

8    government.  First, anything you'd like to say, and then, also,

9    I have a question for you.

10          If I were to release Mr. McGee on bail, are there any

11    other conditions that you would propose?

12          MS. BHASKARAN:  Yes, your Honor.

13          I believe the other defendants in this case who have

14    been released have a condition to have no contact with certain

15    industry participants.  I don't have the precise details of how

16    we put that in effect, but I believe we provided pretrial with

17    a list of certain companies in the industry that the defendant

18    would not be able to contact.

19          THE COURT:  Okay.  That's important.

20          Well, I am leaning that way.  So if there's something

21    else you want to say that you think might change my mind, now

22    is the time to say it.

23          MS. BHASKARAN:  I don't know that I have any

24    additional points, your Honor, other than to say that it is the

25    government's view that detention is appropriate here and that

M8M7MCG

1    is very much driven by the criminal history, the prior gang

2    membership, and his acquiescence to violence and extortion in

3    this case.

4            THE COURT:  Those are all important points and well

5    stated.

6            This is, as you might imagine, a somewhat close call.

7    Although, I don't think it's determined by presumption, I am,

8    of course, fully aware and devoted to the provision of our

9    Constitution that favors the release on bail.  But to my mind,

10   it always has to be decided on an as complete and careful

11   analysis of the specific facts as the Court can look at at this

12   still relatively early stage in the litigation.

13           The government does not contend that this defendant is

14   a flight risk, and it seems clear from the support he's

15   received that that's very unlikely.  Although, I will still

16   impose, when we get to the provisions, a bond, because I think

17   that has its own moral suasion of a more general sort.

18           I am struck by the fact that Mr. McGee, despite his

19   participation in the past in serious criminal activity, does

20   and has given signs in maturing in just the way defense counsel

21   mentioned.  It's always difficult for someone who has joined a

22   gang at an early age and looked to the gang for leadership and

23   support to suddenly come to the realization that that is the

24   path to ruin, to a lifetime of incarceration at one point or

25   another, to the disregard for the family and other people who

M8M7MCG

1    place such great faith in him.  That realization comes slower

2    to some and faster to others, but I do think defense counsel

3    has made a persuasive showing that Mr. McGee is moving in that

4    direction in meaningful ways.  And it is impressive that that

5    position is supported not just by family, but by prospective

6    employers, by participants and programs in which he's played a

7    role and so forth.  This is as full of support as one could

8    imagine in these circumstances.

9          I'm also persuaded that the evidence so far presented

10   to the Court of Mr. McGee's own involvement in violence or even

11   acquiescence in the violence of others is modest at best

12   compared with some other defendants in this case.  It is quite

13   modest.  So it seems to me that there is a set of conditions

14   that reasonably could warrant Mr. McGee's release and assure

15   against further danger to the community.

16          Although, I want to emphasize to Mr. McGee that even

17   the slightest violations of the conditions I'm about to set

18   would almost certainly change my mind and result in your bail

19   being revoked.  But I'm sure you understand that; yes?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  So the first condition is that the

22   defendant will be subject to electronic monitoring as

23   determined by the pretrial services, and that he will reside,

24   at all times, at Ms. Ramirez's residence in Newark, as I

25   understand it, except when he receives prior pretrial approval.

M8M7MCG

1   Now, this could be for employment, for example, it could be for

2   medical purposes, it could be for meeting with counsel, but it

3   always requires prior approval of pretrial services.  If I ever

4   hear, for example, oh, gee, it was an emergency, I just had to

5   leave, so I didn't have time to call pretrial services, or, I

6   couldn't reach pretrial services, forget it; I would revoke

7   bail.  So any release requires pretrial services' prior

8   approval.

9            Third, the defendant is restricted to the District of

10  New Jersey and the Southern District of New York.  Fourth, the

11  defendant will not associate with anyone who he knows to be a

12  member of the Bloods, and/or with any member associated with

13  any of the defendants in this case, and/or with anyone who he

14  knows has been previously convicted or was charged with pending

15  crimes.  Mr. McGee has so many good people who support him that

16  he doesn't need to worry about being lonely.

17           Fifth, he will not associate with companies, and I'll

18  adopt by reference and we'll get the exact wording from the

19  previous bail conditions regarding that provision.  I'll leave

20  that for counsel for both sides to work out.  Finally, he must

21  provide a $300,000 recognizance bond cosigned by at least four

22  financially responsible people.  And the government will make

23  the initial determination as to whether that has been met.

24           Now, it follows from that last condition that he will

25  not be released today because we'll have to put all these

M8M7MCG

1    arrangements in place.  But if there are any difficulties

2    expeditiously putting all of this into place, counsel should

3    jointly call the Court and we'll make sure this gets expedited

4    so that Mr. McGee shall be released in the next few days, even

5    though he can't be released today.

6              All right.  Is there anything else anyone else wants

7    to raise at this time?

8              MS. BHASKARAN:  No, your Honor.

9              THE COURT:  Defense?

10             MS. BARRETT:  No, your Honor.

11             THE COURT:  Very well.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25